### 20666

The INSURANCE COMMISSION of South Carolina through John W. Lindsay, Chief Insurance Commissioner and John W. Lindsay as Rehabilitator of New South Life Insurance Company, Appellants, v. NEW SOUTH LIFE INSURANCE COMPANY, the South Carolina Life & Health Insurance Guaranty Association, Lester Bates, Sr.. Shareholder and Chairman of the Board of New South Life Insurance Company, Lester Bates, Jr., President and Shareholder of New South Life Insurance Company, Edward K. Pritchard, Jr., Executor and Trustee of the Estate of Edward K. Pritchard, Shareholder of New South Life Insurance Company, and Certain Public Shareholders Represented by Andrew Berry, Esquire, Respondents, and New South Life Insurance Company, through John W. Lindsay, Chief Insurance Commissioner of South Carolina and Rehabilitator for New South Life Insurance Company, Appellant.

(244 S. E. (2d) 289)

---

614

*Victor S. Evans,* Deputy Atty. Gen., *A. Camden Lewis,* Asst. Atty. Gen., and *H. Kelley Jones,* Gen. Counsel, Columbia, *for appellants.*

*C. Heyward Belser,* of *Belser, Baker, Belser, Barwick & Toal,* and *E. McLeod Singletary,* of *McNair, Konduros, Corley, Singletary & Dibble,* Columbia, *for respondent New South Life Ins. Co.*

*David W. Robinson,* Columbia, *for respondent Certain Non-Management Directors.*

*Lincoln C. Jenkins, Jr.,* Columbia, *for respondents Policyholders.*

*Terrell L. Glenn,* Columbia, *for respondents Lester Bates, Sr.* and *Lester Bates, Jr.*

*Edward K. Pritchard, Jr.,* Charleston, *Executor and Trustee of the Estate of Edward K. Pritchard, Shareholder of New South Life Ins. Co.*

*Andrew Berry,* Orangeburg, *for respondents Certain Public Shareholders.*

*Charles W. Knowlton* and *George S. King, Jr.,* Colum-bia, *for respondent S. C. Life & Health Guaranty Association.*

April 18, 1978.

*Per Curiam:*

In this appeal the appellants indicated above contest the correctness of the circuit judge's order in a declaratory judgment action seeking to have the court declare the status and responsibility of Chief Insurance Commissioner John W. Lindsay as rehabilitator of New South Insurance Company. The agreed statement of facts, as appears in the transcript, is as follows:

## STATEMENT

"The Insurance Commission of South Carolina by John W. Lindsay, Chief Insurance Commissioner, and John W. Lindsay as Rehabilitator of New South Life Insurance Company appeals from certain oral rulings made by Judge John Grimball during a hearing in the above captioned cases, which began on October 25, 1976, and concluded on October 29, 1976, and from an order filed June 1, 1977. Notice of Intention to Appeal was given on June 3, 1977.

"New South Life Insurance Company (hereafter called New South) is a domestic life insurance company chartered by the State of South Carolina in the year 1955 and licensed to do business only in the State of South Carolina. It began its insurance operations late in the year 1955. The bulk of the insurance business in force is monthly debit ordinary life insurance (MDO) and small blocks of regular ordinary life insurance, hospital and surgical and accident insurance policies. In life insurance terminology, the operations of the company are conducted on the debit system where premiums are collected at the home of the policyholder by agents who call on a regular basis.

"In the month of October, 1971, it was determined that New South Life Insurance Company had a reserve deficiency

of approximately $7,500,000.00 and was, therefore, insolvent. After the situation came to light, an examination of the company's affairs was conducted by the Chief Insurance Commissioner and the Commissioner filed his petition dated March 29, 1972, against New South asking that he be appointed Rehabilitator of New South and that other remedial action be taken. By order of the same date, Commissioner Lindsay was named Rehabilitator and Honorable Matthew Perry was appointed to represent policyholders.

"New South filed its return dated March 31, 1972, praying among other things that a Plan of Rehabilitation, copy of which was attached to its return, be ordered into effect for New South. In that Plan, restrictions were established on the payment of obligations of New South in respect to its policies. Those restrictions were referred to as a 'Lien' against those policies, and the aggregate amount thereof was, pursuant to the Plan, required to be shown on the Company's balance sheet as an asset.

"Simply stated, the Rehabilitation Plan provided for a moratorium on cash values and the Plan established a 'lien asset' on the Company's balance sheet for all of the cash values of the old monthly debit ordinary business which was the block of business under-reserved.

"The Plan of Rehabilitation as presented to and approved by the Court includes that the operations of the Company contemplate the maintenance of $300,000.00 in capital and $300,000.00 in surplus as of the end of any calendar year. Thus, to create a statutorily solvent company for the purposes of operations under the Plan of Rehabilitation, the lien was imposed on cash and loan values of the MDO business which meant that the cash or loan value thereafter would be reduced by the amount of the 'lien.' If he chose to surrender his policy, he would receive a participation certificate for the amount of the 'lien' which would bear interest, and would be paid as and when the Company came out from under the Plan of Rehabilitation. The 'lien' was waived

on all policy maturities and death claims, which were permitted to be paid.

"The Chief Insurance Commissioner filed his response to the return of New South on April 10, 1972, asking that a Plan of Rehabilitation attached to that response be considered by the Court. In that Plan, the restrictions on the payment obligations of the Company and the associated 'lien asset' were described in the same words as in the Company Plan.

"On May 11, 1972, the Chief Insurance Commissioner filed an Amended Response.

"A hearing with respect to the adoption of the Plan of Rehabilitation was held on May 23, 1972. Notice of the hearing was mailed or delivered to each of the Company's policyholders; notice was given to each stockholder; and notice of the hearing was published in newspapers of general circulation in twelve (12) cities in South Carolina.

"Thereafter, the Court on June 5, 1972, adopted the Plan of Rehabilitation, confirmed the appointment of the Chief Insurance Commissioner as Rehabilitator and of Honorable Matthew Perry as attorney for policyholders (Mr. Perry has since been succeeded by Honorable Lincoln C. Jenkins), and of Honorable Andrew Berry as attorney for minority shareholders, enjoined proceedings instituted or threatened by policyholders and stockholders against the Directors and managers of the Corporation, and adopted the Plan of Rehabilitation attached to the Order. No party appealed from the Orders of March 29, 1972, and of June 5, 1972.

"On March 5, 1975, the then Chief Insurance Commissioner, Howard B. Clark, issued a Cease and Desist Order based on South Carolina Code Section 37-112, directing New South to discontinue the writing of new policies. Upon the petition of New South, the Circuit Court issued an Order which enjoined the implementation of this Administrative Order pending a hearing before the Court. Subsequently,

the South Carolina Insurance Commission withdrew this Cease and Desist Order and determined to conduct an administrative hearing under South Carolina Code Section 37-101, *et seq.*

"After notice, the Commission, beginning May 15, 1975, and thereafter on November 5, 1975, conducted administrative hearings to inquire into New South's ability to meet the statutory requirement for insurance companies and to review the 'lien asset theory'. The Commission ruled that it had jurisdiction to issue a Cease and Desist Order despite the Order of Rehabilitation by the Court. The Commission concluded that without the infusion of new capital, New South would not meet the minimum capital and surplus requirements ($600,000.00) by January, 1976. The Commission's Order provided that the operations of New South should be kept intact until the exhaustion of pending efforts for assumption, for the infusion of new capital or a guaranty by the Life and Health Guaranty Association to assume the policy obligations of New South. The Order provided that in the event that infusion of new capital is not accomplished, the Commission 'shall direct issuance of a Cease and Desist Order and petition the Court accordingly.'

"The Commission also made the following finding of fact:

'The Commission further finds that even with an infusion of capital of up to $1,500,000, that New South is potentially unable to fulfill its contractual obligations to policyholders.'

"From this Order of the Commission, the Company and certain of the Non-Management Directors petitioned for review by this [the trial] Court.

"Thereafter, after an evidentiary hearing on the 3rd and 4th day of June, 1976, and in light of the pendency in the South Carolina Supreme Court of the action brought by the Insurance Commission against the Guaranty Association, the Court recessed the hearing and enjoined the Commission from issuing a Cease and Desist Order until after the Su-

preme Court decision. A later Order extended this injunction until October 18, 1976.

"On September 9, 1976, the Supreme Court of South Carolina filed its opinion in *South Carolina Insurance Commission v. South Carolina Life and Health Insurance Guaranty Association,* 267 S. C. 378, 228 S. E. (2d) 273, holding that since New South became an impaired insurer prior to the effective date of the Guaranty Statute, the Association was not obligated to assume the policy obligations of New South.

"On September 14, 1976, John W. Lindsay, Chief Insurance Commissioner and Rehabilitator, presented to the Court a petition asking that the Court temporarily restrain and thereafter temporarily and permanently enjoin New South from issuing new policies. At that time, the Petitioners presented to the Court a proposed Order temporarily restraining the issuance of new policies. The Court refused to issue a temporary restraining Order without a hearing at which all interested parties would have an opportunity to be heard. All pending motions relating to New South were set for hearing on October 18, 1976.

"On September 29, 1976, Mr. Lindsay filed an Amended Petition requesting the same relief. Returns to the Amended Petition were filed by New South and by certain of its directors.

"Under date of September 30, 1976, a Declaratory Judgment case was instituted. It asked the Court to determine the responsibility of the Insurance Commission and of the Chief Insurance Commissioner in the matter of rehabilitation of New South. The Demurrer to the declaratory judgment action of the Chief Insurance Commissioner commenced September 30, 1976, interposed by the South Carolina Life and Health Insurance Guaranty Association has not yet been disposed of.

"In an effort to put before the Court all relevant questions, the Insurance Commission of South Carolina asked

specific questions of the Court with respect to its position and the handling of New South Life Insurance Company under a Plan of Rehabilitation.

"During the week of October 25, 1976, the Court heard all of the evidence which the parties wished to offer on the various issues presented by the pleadings, the petitions for review, and the several petitions. The questions raised by the Amended Petition and the declaratory judgment action of the Insurance Commission of South Carolina, as well as the question raised on an appeal from the Administrative Order of the Insurance Commission were presented to the Court in a five-day hearing. The Court filed its order on June 1, 1977." [End of agreed statement.]

In the order the court found that rehabilitation under the direction of the Chief Insurance Commissioner had been a financial success and should be continued until a better plan is submitted and approved. It further found that a subsidiary, wholly owned by New South, should be created and all policies issued after its creation written by it, and in the meantime that New South could continue to write new policies. The order further provided:

(a) That New South should continue under the 1972 order of rehabilitation and under the supervision of the court;

(b) That the parties to this action and all who have a financial interest in rehabilitation continue their efforts to find another insurance company or investor that will be willing to infuse new capital into the business to effectuate New South's solvency upon a fair, reasonable, and equitable basis;

(c) That the Commissioner formulate a plan for creation of a wholly-owned subsidiary to assume all of the business of New South, the principal object of which is to continue the insurance business of New South and issue policies which come under the protection of the South Carolina Life and Health Insurance Guaranty Law.

(d) That the injunction previously issued against the prosecution of suits against the officers and directors of the corporation in behalf of policyholders or behalf of stockholders be continued until the further order of the court.

The order held that the Commissioner, not the Commission, was responsible for rehabilitation. The court concluded that in the event that the rehabilitation and financial solvency of New South could not be resolved by some other equitable method that the issue should again be presented to the court not later than December 1, 1977 (which was six months after the signing of the order). It is from the oral rulings of the court and from the written order of the court dated June 1, 1977, that the rehabilitator appeals.

Since New South was chartered in 1955, Lester L. Bates, Sr. (who promoted and organized it) has been its dominating force and now serves as Chairman of the Board of Directors. His son, Lester L. Bates, Jr., has for some time served as president. They own a majority of the stock and have, for all intents and purposes, been the management both before and since the declaration of insolvency.

Defendant Edward K. Pritchard was, prior to his death, a substantial stockholder and director; his executor and trustee, Edward K. Pritchard, Jr., succeeded to control of his stock and is a party defendant to this action.

New South has about 135,000 policyholders and approximately 1,100 stockholders.

The Insurance Commission is a creature of statute, having been brought into being by § 38-3-10, *et seq.* of the Code of Laws of South Carolina (1976) (formerly § 37-51 of the 1962 Code.) Section 38-3-60 spells out the powers and duties of the Commission.

Section 38-3-80 provides that the Commission shall elect a Chief Insurance Commissioner. It specifies his qualifications: "The Commissioner shall be selected with special ref-

erence to his training, capability and experience." John W. Lindsay is the Chief Insurance Commissioner and he has, by reason of § 38-5-1560, been appointed rehabilitator (*i. e.* the receiver) for New South, with directions by the court . . . "to proceed with the rehabilitation or liquidation of the company or to take such other appropriate proceedings as he deems advisable."

Andrew Berry (an attorney) is a party defendant because he represents certain public (minority)) shareholders who desire to sue those who managed New South prior to its insolvency. Until this time such action or actions have been enjoined by the trial court.

Life and Health Insurance Guaranty Association was brought into being by an act of the legislature in 1972 in order to provide protection for insurance policyholders and to maintain confidence in the promises of the insurers. We are concerned with 1976 Code § 38-17-10, *et seq.* (§ 37-561, *et seq.* of the 1962 Code), which deals with life and health insurance.

The order of the court. appointing the Chief Insurance Commissioner as rehabilitator, has now been in effect approximately six years. In actuality, the "plan of rehabilitation" approved by the court is not a plan of rehabilitation. It cannot be seriously argued that the plan would ever solve the problems of New South or rehabilitate it. The plan is more of a holding pattern, designed to maintain the status quo until some satisfactory offer to purchase the assets of the corporation can be procured, or until someone willing to infuse substantial capital into it can be found.

The order has succeeded in holding the company's operation together by way of what might be termed "an operating receivership," but the policyholders are not substantially better off than they were six years ago. The old policyholders are still denied full benefit of their insurance contracts and may not exercise their cash surrender option or procure loans in keeping with the terms of the insurance agreements.

We think it inescapable that the failure to make more progress towards solving the company's problems has been brought about by dissention between the interested parties and the failure of the court to anchor down authority, responsibility and duty. By this opinion, we undertake to resolve this facet of the rehabilitator's dilemma.

The issues to be resolved in this action involve a conflict of interest between the stockholders on one hand and the policyholders on the other hand. They are the real adversaries. It is inferable from the evidence that the stock of New South, today, is worthless. We need not at this time determine if it has any potential future value. If an offer for the assets of the company can be procured, restoring the rights of the policyholders and at the same time providing remuneration for the stockholders, that offer should be accepted, but an offer should not be accepted which benefits the stockholders at the expense of the policyholders. Commissioner Lindsay emphasized the relationship between the two groups in his testimony when he said:

"Your Honor, may I make a statement here concerning something that I don't think has ever been squarely hit and if it has I apoligize, but in terms of the ultimate benefit which may or may not ever come about to shareholders I would like to make the point that any funds less than the immediate restoration of the deficiency which are presently given to shareholders either as to the length of time required or just —I would pose you this example—suppose if we would all agree in this room and the shareholders would all accept, we'll say, $500,000 right now for their shareholder interests. Let Mr. Harden and Mr. Broome calculate it for you right away what $500,000 compound interest at eight and a half per cent for the next seven years would do in conjunction with the period of time of rehabilitation of policyholders. That is our point, sir. We're not unalterably 'damned the rascals' approach. That's not it at all. It's the fact that anything less than the full restoration is being financed by pol-

icyholders and it is our duty as the commissioner and the commission to restore those people as promptly as possible and anything less than that extends the time or makes less likely for them to get the benefits. So I wanted to be sure that this point is clear on the record."

Further testifying, he said:

"I tried to state the position I think of the commission and the insurance people and I've restated it to the Judge, that any dollar immediately diverted for [*sic*] the use of policyholders for the benefit of shareholders is not acceptable to the commission nor to me as chief insurance commissioner."

We now reach the issues raised on this appeal.

## THE INSURANCE COMMISSION'S AUTHORITY

The first question posed by the appeal to this court is as follows:

What is the regulatory authority of the lower court and of the South Carolina Insurance Commission with respect to New South Insurance Company?

The second question is related and will be discussed along with the first. It is:

Should the lower court have overruled and/or enjoined the administrative order of the Insurance Commission dated January 22, 1976?

Both the Insurance Commission and the Chief Insurance Commissioner are creatures of statute. We therefore look to the statutes to ascertain the duties and responsibilities of each.

Section 38-5-1570 provides that an order of rehabilitation by the court vests title to all of the property, contracts and rights of action of the company as of the date of the court order, in the Chief Insurance Commissioner as Rehabilitator. Section 38-5-1580 authorizes the Commissioner as Rehabilitator . . . "to appoint special deputies as his agents

and to employ such counsel and other persons for the purpose of efficiently conducting such rehabilitation or liquidation, and may delegate to each of them the powers vested in him."

Section 38-5-1610 requires the rehabilitator to file annual reports with the Court.

Section 38-5-1630 imposes upon the Commissioner as Rehabilitator the duty of preparing a plan of rehabilitation or mutualization.

Presumably, the statute provides for the appointment of the Insurance Commissioner because of his expertise required by § 38-3-80, referred to hereinabove. He serves as an arm of the court. The Commission, as such, is not the rehabilitator, nor does the statute impose upon the Commission any duties or authority incident to the rehabilitation. The Chief Commissioner may, of course, advise with the Commission and its members, but the responsibility of rehabilitation is imposed, not upon the Commission, but upon the Chief Commissioner, both by reason of the statute and by reason of the court order of appointment. It follows that the administrative order of the Insurance Commission, dated January 22, 1976, was without authority, and the judge correctly so held. By this ruling we do not indicate that we are in disagreement with the Commission's administrative order. Much of the relief which the Commission attempted to grant might properly have been ordered by the court.

The rehabilitator is answerable to the court, as is a receiver in other ordinary insolvency matters. The statute might have required the appointment of the Commissioner of Agriculture, or "John Doe." No doubt the statute recognizes the fact that the court has neither the expertise nor the time for operating an insurance company receivership. It accordingly required the appointment of the Chief Insurance Commissioner, who has the expertise in the insurance field. At most, the court can be expected to act in

a general supervisory capacity, approving or disapproving the recommendations and actions of the rehabilitator. In like fashion, the court must resolve any disputes arising from conflicting interests of the various parties.

## THE PLAN OF REHABILITATION

The next questions posed on the appeal are:

■■ Should New South Life Insurance Company be under a plan of rehabilitation and, if so, under what limitations?
and

Is the progress acceptable?

As indicated hereinabove, the "plan of rehabilitation" is not truly a plan expected to rehabilitate New South. The stockholders have refused to infuse new capital into the company. The management is the same; the stockholders continue their equity ownership in the company; the company continues to sell new policies and no part of the overall problem has been truly solved. There has been no reassurance for policyholders; there has been no assumption by a solvent life insurance company and no mutualization. There has been no formation of a new company, nor has reorganization taken place. The company has been permitted to continue in business substantially as before.

While the "plan of rehabilitation" has not in these six years solved the problems of the company, we think that the same must continue with modifications until an acceptable alternative is proposed and put into operation, but this cannot be unduly delayed. If the "plan of rehabilitation" to this point has been a success, it is not appreciable and is only in the sense that the status quo has been maintained. The progress made is not acceptable and alternatives should be promptly pursued by the rehabilitator.

## NEW POLICIES

Question: Should New South continue to issue new policies?

By order, in 1972, the court in adopting the so-called plan of rehabilitation, permitted the company to continue to sell new policies of insurance to the public. Since that time agents, of whom there are some 80 or 90, have continued to sell and New South has continued to issue new contracts of insurance. On several occasions the rehabilitator has sought to have the court enjoin this practice. New South insists that it must continue to sell new policies to prevent the collapse of any rehabilitation plan. It submits that the agency force cannot be maintained without the right to sell new contracts. The rehabilitator takes the position that the sale of these insurance policies is hazardous to the public. The lower court, in its order, recognizes: "New South cannot be permitted to sell insurance and to issue policies indefinitely under these circumstances." We agree.

New policies have now been issued for approximately six years by New South. The propriety of this has not heretofore been submitted to this court. It is certain that a better offer can be procured for the sale of the assets if the company's organization is maintained until a transfer can be effected. In the light of the action we hereinafter direct, sale of the assets should be effected and finalized in a comparatively short period of time. We therefore retain under advisement the issue of whether the lower court erred in permitting a continuation of the sale of policies and whether this should be enjoined by this court. A supplemental opinion dealing with this issue may be filed, if needed, at an appropriate time.

## DERIVATIVE SUITS

Question: Should actions against management be further enjoined?

Attorney Andrew Berry, representing minority stockholders, has sought to bring actions against the company's officers for mismanagement. The action was enjoined in 1972 and the injunction was continued by the order of the circuit court dated June 1, 1977, from which this appeal arises. All assets of the company are vested in the rehabilitator by statute referred to hereinabove. Any recovery would be an asset of the New South corporation. Accordingly, it becomes the duty of the rehabilitator to consider the advisability of bringing an action for mismanagement. The court is aware of the fact that this places the rehabilitator in an awkward position because he has continued in office, in management of the company, those persons against whom actions might be brought. In other words, he is put in the position of having to decide whether to sue his own employees while they continue to serve. At the same time, under either the statute or under the 1972 order, the rehabilitator has full authority to discharge any employees. Counsel for New South concedes that these actions may not be postponed indefinitely, and counsel takes no position with respect to that portion of the order which continues the injunction. We conclude and hold that the court erred in continuing the injunction against the derivative suits. Before any action is taken on this issue, Attorney Berry should be consulted and given an opportunity to be heard.

## THE STOCKHOLDERS

Question: What interests do the stockholders have in the litigation and in New South?

All interested parties agree that the rights of the policyholders are paramount. The interest of the stockholders is secondary. Rehabilitation would have been accomplished if the stockholders had infused sufficient capital into the cor-

poration, but this they have not done. Another alternative is to find a purchaser who would take over the assets and honor the corporation's commitments. Ideally, a purchaser of the assets might be procured who would be willing to make both the policyholders and the stockholders whole immediately. In light of the fact that this is a comparatively small insurance corporation with a deficit of approximately ten million dollars, such a proposal may not be realistic.

Though the proceeding is referred to as "plan of rehabilitation", it is in effect merely a receivership of an insolvent corporation, and neither policyholders nor stockholders should attach more significance to the word "rehabilitation" than is warranted by an analysis of the data available. It my be possible for the stockholders to salvage something out of the rehabilitator's action. This will depend upon the rehabilitator's ability, and that of other interested parties, to attract an advantageous purchaser.

A proposal was submitted to the lower court by Life Investors, Inc., a life insurance holding company, which would have been highly beneficial to the policyholders. It contemplated the purchase of the assets of New South, but would have resulted in elimination of the stockholders' interest. The plan was understandably opposed by the Messrs. Bates in their capacity as majority stockholders. It was also opposed by the management of New South, which in effect was the Bates. Judge Grimball described this proposal as follows: "I don't think there is any question about the fact that Life Investors, Incorporated, plan is solid gold for the policyholders but the trouble is that a life insurance company is not made up simply of policyholders."

One hundred and thirty-five thousand policyholders have an interest in the outcome of this litigation.

Probably few, if any, of them have enough involved to warrant the expense of litigation and payment of their own counsel. They are entitled to the best legal representa-

tion available and it is the duty of the lower court to see that their interests are protected. While the rehabilitator in one sense of the word represents the policyholders, he does not represent them in an adversary sense because he is the arm of the court and must do justice to all.

Mr. Lincoln Jenkins was appointed to represent the policyholders. He did not advocate the adoption of this proposal, but rather took the same position as the Bates. In oral argument before this court, he attempted to explain his failure to advocate that plan and pursue it because, and we quote: "The position that the policyholders took was that if the— if the shareholders were ruled out entirely so that they lost everything, the good will that they had and which was an asset to the company itself would have been lost, and so that the alleged benefit to the policyholders would not have been —it only disappeared, and so that we would have ended up in a worse shape than we were in." This left only the rehabilitator advocating the Life Investors, Inc. plan.

That plan should not have been rejected merely because it did not provide for the stockholders. In any ordinary receivership, the stockholders do not receive anything until and unless all creditors are first made whole. In like fashion, the shareholders in New South cannot expect to receive benefits until and unless the policyholders are made whole by restoration of their contract rights.

Delay of the restoration of the policyholders' rights cannot be unduly prolonged because it might be advantageous to the stockholders. The policyholders' rights should be restored within a reasonably short time hereafter, or the company should be mutualized [1]. The policyholders' interests come first. They have been denied their rights for six years already, and they should not be required

---

[1] Mutualization is a process whereby stockholder interest would be extinguished and the policyholders would become the sole owners of the company and would share in the profits. In effect, a mutual insurance company is formed.

to forego benefits of their policy contracts for an extended time while the stockholders hope for a sale advantageous to them.

We have answered all of the questions set forth in the Chief Insurance Commissioner's appellate brief except the last, which is:

What should be done with the New South Life Insurance Company?

Before answering this question, there are two matters not directly on appeal which attract the court's attention.

FIRST: The plan of rehabilitation provided a lien upon the cash and loan values of insurance policies issued prior to April 1, 1971. It further provided that the lien be shown in the balance sheet as an asset equal in the aggregate to 100% of the cash surrender values as defined in the plan. In effect, this allowed New South to use as a fictitious asset the value of the liens established against policyholders' contract rights. It gave to the company a false appearance of solvency. Such treatment of the lien was erroneous. We agree with counsel for New South when he said at a hearing before Judge Grimball: "It [the lien] never has been a collectible asset. It's been a cosmetic sort of entry that achieved certain purposes." The lien will no longer be treated as an asset.

SECOND: Corporate New South is not an improper party to the action now before us, but we are not at all sure that it is a necessary party. The position taken by New South is identical with the position taken by the Messrs. Bates, as majority stockholders. The Chief Insurance Commissioner, as rehabilitator, is successor to New South and now holds all of its assets under the statute quoted hereinabove. The position of the management of New South should be: "New South has been succeeded by the rehabilitator, and directions of the court are awaited." The

managers of New South are employees of the rehabilitator and they are not at liberty as managers and employees of the company to take a position contrary to that of the rehabilitator. Obviously, the Bates, as majority stockholders, are at liberty to take any position they choose.

New South may not sue or be sued. It has no litigation identity. The rehabilitator is somewhat the *alter ego* of New South, and New South may not litigate with its *alter ego*.

The judge was concerned with the fact that litigation costs to New South have been tremendous. He stated that a total of $734,000.00 has been paid out in legal, accounting and actuarial fees since 1972. He said that this amount might, except for the litigation, . . . "have been profits." All parties should act diligently to bring this litigation to a final termination at a minimal expense to the interested parties.

## THE FUTURE OF NEW SOUTH

Question: What should be done with New South Life Insurance Company?

It is inferable from the evidence that several reliable companies are interested in submitting proposals designed to acquire the assets of New South and assume its liabilities. It has apparently been the thinking of the lower court that no proposal should be considered, or certainly approved, unless it provided benefits to the stockholders. The judge said in his order, "It would not be a difficult task to find an investor today to assume all assets and all liabilities of New South, if the court would permit that investor to discharge the officers and directors of New South, take complete charge of the company and wash out the common stockholders as the owners of valueless stock shares." Plans may be considered which restore the policyholders and also provide benefits for the stockholders, if such a proposal is available. But plans should not be rejected merely because no benefits are provided for the stockholders. The rehabilitator should adver-

tise for proposals for a period of forty-five days, evaluate all of them and recommend to this court within sixty days that plan which in his opinion should be adopted, keeping in mind that the interest of the policyholders is paramount. Upon receipt of the proposals, this court will act upon the recommendation and approve or disapprove the same, or remand the matter to the circuit court, or refer the matter to a special master in keeping with § 14-3-340 of the 1976 Code, or take such other action as to this court may appear appropriate.

By adopting this approach to the problem, the court undertakes to avoid the prolonged delays often encountered by the lower court in hearing disputed matters and encountered by this court in processing appeals. No action will be taken upon the proposals without ample opportunity to all interested parties to be heard.

## MR. LANEY'S MOTION

After the order here on appeal had been filed on June 1, 1977, the National Cold Storage Company, Inc., and National Seaboard Terminal, Inc. (referred to collectively as National) submitted an offer to the lower court whereby it proposed to infuse into New South approximately ten million dollars in the form of three cold storage buildings located in New York and in New Jersey. A hearing was held, resulting in an order of the court approving the proposal. That order has been appealed to this court, and of that proceeding we take judicial notice. Heretofore, this court was petitioned to consolidate that appeal with the one now under consideration. Such was rejected because of the delay necessarily encountered.

At the time this appeal was heard on its merits, Mr. E. W. Laney, of counsel for National, filed a motion in this court asking that the appeal *sub judice* be delayed until the second appeal can be heard on its merits. It is submitted that the order of approval by the lower court makes the order of June 1, 1977, and this appeal moot.

We are not at all sure that the judge was permitted to pursue the matter further, in the light of *McDonald v. Palmetto Theaters,* 196 S. C. 38, 11 S. E. (2d) 444 (1940), but we need not determine the issue on this ground.

The rehabilitator apparently recommended National's proposal as being better than the status quo. On this appeal, he takes the position that a better proposal can in actuality be procured. All proposals should be received and evaluated as indicated hereinabove, whether they provide benefits for the stockholders or not. It is apparent that National's proposal, as well as the two others considered by the court, was submitted in the light of the view taken by the lower court. If National's offer is to be accepted, it must "meet the competition" and be evaluated in the light of any other proposals which may be made, consistent with the views herein expressed.

We have before us, as a part of Mr. Laney's motion, National's proposal, and the order of the lower court approving the same. We do not undertake to say that the proposal is acceptable or unacceptable. We think it is not in a posture for approval until and unless it be established that it is better than other proposals which may be procured. In the meantime, National may wish to substitute a proposal. Accordingly, until the further directive of this court, the order of Judge Grimball approving National's proposal is superseded, and the case here on appeal is remanded for further action consistent with the views herein expressed.

This court retains under advisement the question of whether New South should be enjoined from issuing new policies. This court also retains jurisdiction for the purpose of acting upon proposals procured by the rehabilitator as indicated hereinabove. All other facets of the case are remanded to the lower court.

Affirmed in part;

Reversed in part; and

Remanded.